UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES TRIGG, JR.,                    )
                                     )
        Plaintiff,                   )
                                     )        No. 4:05CV931 FRB
                                     )
v.                                   )
                                     )
                                     )
JO ANNE B. BARNHART,                 )
Commissioner of Social Security,     )
                                     )
        Defendant.                   )

**MEMORANDUM AND ORDER**

        This matter is on appeal for review of an adverse ruling
by the Social Security Administration. All matters are pending
before the undersigned United States Magistrate Judge, with consent
of the parties, pursuant to 28 U.S.C. § 636(c).

**I.  Procedural Background**

        On March 24, 2003, plaintiff James Trigg, Jr., ("Plaintiff")
filed an application for a Period of Disability and Disability
Insurance Benefits ("DIB") under Title II of the Social Security
Act, and protectively filed for Supplemental Security Income
Benefits under Title XVI of the Social Security Act on February 24,
2003. (Transcript, ("Tr."), 11, 56-59, 110-123.) Plaintiff claimed
he became disabled as of July 4, 2003 due to bilateral hip pain,
manic depression, emphysema, bipolar disorder, sleep apnea and
restless leg syndrome. (Tr. 12, 113.) On initial consideration,
the Social Security Administration denied both of Plaintiff's

- 1 -

applications for benefits on June 19, 2003. (Tr. 11, 39-43, 245-50.)

On July 18, 2003, Plaintiff requested a hearing by an Administrative Law Judge ("ALJ"). (Tr. 35.) On August 2, 2004, a hearing was held before an ALJ, during which Plaintiff testified and was represented by attorney Jeffrey Bunten. (Tr. 264-280.) The ALJ issued a decision which was unfavorable to Plaintiff on December 17, 2004, and Plaintiff filed a Request for Review of Hearing Decision with defendant Agency's Appeals Council on February 14, 2005. (Tr. 8-20.) On May 6, 2005, the Appeals Council denied Plaintiff's request for review. (Tr. 3-6.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  **Evidence Before the ALJ**

A.  <u>Testimony of Plaintiff</u>

At the hearing on August 2, 2004, Plaintiff testified in response to a series of questions by counsel and the ALJ. Plaintiff testified that he is forty-seven years of age, right-handed, five feet and eleven and three-quarters inches tall, and weighs 235 pounds. (Tr. 267-68.) He currently lives in a mobile home with his wife. (Tr. 268.) He never served in the military, and he testified he finished the twelfth grade. (Tr. 268.) Plaintiff testified that he last worked in July of 2002 as a sheet metal shear operator. <u>Id.</u> He quit this job to serve a prison sentence for  unlawful use of a

weapon.[1]  Id.  As of the date of the hearing, he was not on probation or parole.  Id.

Plaintiff testified that he is unable to work due to the following health problems: pins in both hips following surgery at a much younger age, emphysema, bipolar/manic depressive disorder, and sleep disorder.  (Tr. 268.)  Plaintiff testified that his left hip feels worse than his right, but that he suffers pain in both hips upon climbing, excessive walking, carrying something with extra weight on his hip, bending and stooping.  (Tr. 269.)  Plaintiff identified "excessive walking" as anything over fifteen or twenty minutes.  Id.  He stated that the only way to alleviate his hip pain was to lie on his stomach.  Id.  Plaintiff testified that he has not recently seen a doctor for his hips because he has been unable to afford to, and has no insurance.  Id.  Plaintiff testified that he began using a cane, which had previously belonged to his wife's grandmother, four months ago after his hip "gave out" and caused him to fall while exiting a car.  (Tr. 269-70.)  Plaintiff testified that, since using the cane, his hip has not "given out." (Tr. 270.)

Plaintiff testified that, due to his emphysema, he is unable to walk anywhere or do strenuous labor.  Id.  He defined "strenuous" as climbing stairs or carrying something heavy that

[1]The record indicates that Plaintiff was initially confined on July 17, 2002, and was convicted and sentenced in Jefferson County, Missouri on August 28, 2002.  (Tr. 54-55.)  The record further indicates that Plaintiff began serving a two-year prison sentence on September 5, 2002, but was paroled on January 2, 2003.  (Tr. 55.)

would cause him to "breathe harder than normal," and defined "heavy" as a twenty-five pound bag of dog food.  Id.  Plaintiff further testified that he has trouble breathing while walking uphill.  Id.

Regarding his smoking habit, Plaintiff testified that, in July of 2002, he smoked a little over one pack of cigarettes per day, but that, as of the time of the hearing, he smoked only four cigarettes per day.  Id.  It was unclear from Plaintiff's testimony exactly when he curtailed his smoking habit from over one pack of cigarettes per day to four cigarettes per day.  Plaintiff did testify that a doctor told him to quit smoking. (Tr. 270.)

Regarding his medications and treatment for emphysema, Plaintiff's attorney and Plaintiff had the following exchange:

> Plaintiff's attorney:  "You take any kind of insulin or anything like that or a [sic] breathing machine for you [sic] emphysema?"

> Plaintiff: "I'm required.  I'm supposed to take a couple of different kinds.  Atrovent, I can't think of the other one, but it made my breathing worst [sic] so I didn't take it anyway."

> (Tr. 271.)

Plaintiff testified that he had an appointment to go to "the clinic" on August 8th regarding his emphysema.  Id.  Plaintiff did not know the name of the clinic, and testified that his wife had made the appointment for him.  Id.  Regarding his bipolar disorder, Plaintiff testified that he was sometimes stressed out and would just "go off," and that other times, he was so depressed he felt like doing nothing.  Id.  Plaintiff defined "going off" as perhaps

- 4 -

having an anxiety attack, "hollering" at a person, or "griping or walking off the job." Id. Plaintiff testified that his last anxiety attack occurred about five months ago, and was characterized by heart attack-like symptoms, including chest pains, nausea, and an inability to breathe. (Tr. 272.) Plaintiff testified that his medication rarely works properly. (Tr. 271.)

Plaintiff further testified that he believed himself to be depressed due to his attitude and his lack of "get up and go." (Tr. 272.) Plaintiff testified that he used to enjoy playing his guitar and fishing, but that he didn't do these things anymore.[2] Id. Plaintiff testified that, in the last six months, he had experienced several crying spells. Id. Plaintiff testified that he did not think he had any suicidal thoughts in the last six months. Id. Plaintiff testified that he did not sleep at night due to a sleep disorder, and further testified that he often spontaneously fell asleep during the day, while sitting on the sofa and even while driving. (Tr. 273.) Plaintiff testified that, when this occurred, he would sleep for approximately one hour. Id. Plaintiff testified that, due to restless leg syndrome, he "kicked a window out in [his] bedroom," and that the condition causes him to "kick and thrash" all night long. (Tr. 273-74.) Plaintiff testified that he is not currently taking medication for this condition, but that he is going to try to get some medication "on

---

[2]Later in his testimony, however, Plaintiff testified that he played his guitar for approximately one-half hour each day. (Tr. 278.)

the 8th," an apparent reference to his August 8 clinic appointment. (Tr. 274.)

Plaintiff testified that he can stand for twenty to forty-five minutes at a time, after which he must either sit down or shift his weight due to a throbbing sensation in his hip. (Tr. 274-75.) Plaintiff testified that his hip pain precludes sitting in one place for over forty minutes, at which point he had to stand and walk. (Tr. 275.) Plaintiff testified that he spent several hours each day lying on the sofa. Id.

Plaintiff testified that he does not often visit friends or relatives, but does receive visitors at home. Id. Plaintiff testified that he does not belong to any clubs or groups, but that he does attend church on Sunday if he feels "up to it." (Tr. 275-76.) Plaintiff testified that, although he is physically able to attend to his own personal care, his depression sometimes causes him to neglect his personal hygiene. (Tr. 276.) Plaintiff testified that he does not do much housework, with the exception of occasionally placing dirty laundry in a hamper or vacuuming the living room floor. Id. Plaintiff testified that he does not cook or do laundry or dishes, and that he does not do any outdoor work or grocery shopping. (Tr. 276-77.)

Regarding his typical daily activities, Plaintiff testified that he rises around 5:00 a.m., has coffee, and watches the news. (Tr. 277.) At around 7:30 a.m. or 8:00 a.m. he gets sleepy and lies down for a while, after which he rises and may sit

outside on the porch. Id. Otherwise, Plaintiff testified, he remained in his home watching television, reading, or playing his guitar. (Tr. 277-78.)[3] Plaintiff testified that he played his guitar for about 30 minutes per day. (Tr. 278.) Plaintiff testified that he retires for the night at about 9:00 p.m. Id.

Plaintiff was then questioned by the ALJ. He testified that his wife was unemployed and currently drew disability benefits due to a back injury. Id. Plaintiff testified that the last time he drank alcohol was three years ago, and the last time he used illegal drugs was before he was sent to prison.[4] (Tr. 279.) Plaintiff testified that, five or six years ago, he was convicted of driving while under the influence, and that in 1984 or 1985 he was convicted of second-degree burglary as a result of an incident where he became intoxicated, broke into a store, and fell asleep on the floor. Id.

At the time of the hearing, Plaintiff had a valid driver's license. Id. Plaintiff testified that he had applied for factory jobs since he stopped working, and further stated he felt he might be able to do factory work. (Tr. 279.) Following the hearing, the ALJ closed the record. (Tr. 280.)

III.  **Medical Records**

---

[3]Later in the hearing, Plaintiff's attorney asked Plaintiff whether he read during the day, and Plaintiff responded: "I use [sic] to read, I don't read too much no more [sic]." (Tr. 278.)

[4]This is an apparent reference to Plaintiff's September, 2002 imprisonment for unlawful use of a weapon.

The record indicates that Plaintiff was admitted to the Southeast Missouri Community Treatment Center for treatment of long-term alcohol abuse on January 21, 1999. (Tr. 133.) Plaintiff was treated with a variety of counseling methods, including biweekly individual counseling and group therapy ten times per week, and was discharged on February 4, 1999 with a good attitude and positive prognosis. Id.

Medical records obtained from the office of Steven D. Crawford, D.O., indicate that Plaintiff was seen on August 13, 2001 with complaints of insomnia and nocturnal kicking. (Tr. 218.) It is noted that Plaintiff had taken Trazadone,[5] which helped him sleep but did not resolve the nocturnal kicking. Id. The records indicate a diagnosis of depression, anxiety and probable sleep apnea, and recommended psychiatric referral. Id.

On September 12, 2001, Plaintiff was seen by W. Mark Breite, M.D., of the Jefferson Memorial Hospital Sleep Disorder Center with complaints of nocturnal kicking and awakening, and violent behavior at night. (Tr. 209.) At this time, Plaintiff was taking BuSpar[6] and Effexor.[7] Dr. Breite noted a history of anxiety and depression, and further noted Plaintiff's prior bilateral hip

---

[5]Trazadone is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html

[6]BuSpar is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a688005.html

[7]Effexor is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html

pinning surgery with no current complaints of pain.  Id.  Dr. Breite scheduled Plaintiff for a sleep study, which was performed on September 13 and 14, 2001 and revealed severe nocturnal myoclonus and obstructive sleep apnea.  (Tr. 210; 202.)  On September 26, 2001, Plaintiff returned to Dr. Breite for follow-up, and Dr. Breite prescribed Sinemet[8] and a nocturnal C-PAP, and instructed Plaintiff to follow up in three months.  (Tr. 208.)

Dr. Crawford's records indicate that Plaintiff was seen on November 2, 2001.  (Tr. 217.)  It was noted that Sinemet was helping Plaintiff sleep, and that BuSpar had improved Plaintiff's anxiety condition.  Id.

Plaintiff returned to Dr. Breite on December 27, 2001 for follow-up, stating that his condition had markedly improved.  (Tr. 202.)  Dr. Breite noted that the Sinemet had produced good results regarding Plaintiff's nocturnal kicking, but that Plaintiff had not begun use of the C-PAP because his insurance company would not pay for the device.  Id.  Upon examination, Dr. Breite noted that Plaintiff was in no apparent distress.  Id.  Dr. Breite's impression was advanced emphysema with severe airway dysfunction and hypoxemia, and increased carbon dioxide due to chronic tobacco abuse addiction, and severe nocturnal myoclonus improved by Sinemet.  Id.  Dr. Breite

---

[8]Sinemet is used to treat symptoms of shaking, stiffness, and slowness of movement, as seen in Parkinson's disease.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682394.html

advised Plaintiff to decrease his dosage of Effexor, continue taking Sinemet, and prescribed Atrovent,[9] Advair,[10] and Albuterol.[11]

On March 13, 2002, Plaintiff visited Dr. Crawford's office complaining of hoarseness, and was diagnosed with nicotine addiction, dyspepsia, and depression. (Tr. 216.) The records indicate that Plaintiff had not taken Effexor for three weeks, and this prescription was renewed. Id. Dr. Crawford's records reflect that Plaintiff was seen again on April 11, 2002 at which time his hoarseness had resolved. (Tr. 215.)

On May 19, 2002, Plaintiff presented to the emergency room of Jefferson Memorial Hospital complaining of stress, and specifically stated "I can't handle all the things going on in my life." (Tr. 224.) Plaintiff was not suicidal, but reported a past diagnosis of bipolar disorder, past treatment for ETOH use, and current treatment for marijuana use. Id. Plaintiff reported that he felt he needed treatment for "manic depressive" issues, and noted stress caused by his two former spouses, his current spouse, financial strain, step-family issues, and work. Id. Plaintiff was

---

[9]Atrovent is used to prevent wheezing, shortness of breath, and troubled breathing caused by asthma, chronic bronchitis, emphysema, and other lung diseases. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695021.html

[10]Advair is a combination of drugs used to prevent wheezing, shortness of breath, and breathing difficulties caused by asthma. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699063.html

[11]Albuterol is used to prevent and treat wheezing, shortness of breath, and troubled breathing caused by asthma, chronic bronchitis, emphysema, and other lung diseases. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682145.html

diagnosed with hypothyroidism, polycythemia,[12] and depression. (Tr. 223.) He was prescribed Xanax,[13] and was discharged. Id.

Dr. Crawford's records indicate that Plaintiff was seen on May 21, 2002 with complaints of pain in both shoulders, for which he was prescribed Daypro.[14] (Tr. 214.) Dr. Crawford's office notes indicate Plaintiff's treatment in the emergency room for anxiety and stress. Id.

Plaintiff returned to Jefferson Memorial Hospital on May 24, 2002, and was admitted to partial hospitalization by Luis Schwarz, M.D., for depression and fleeting suicidal thoughts. (Tr. 220-21.)[15] Plaintiff stated that he had been raised in a very dysfunctional family, had suffered two failed marriages, had been hospitalized for depression and alcohol abuse, and currently suffered from sleep apnea, insomnia, and pain in his hips. Id. Plaintiff admitted smoking one pack of cigarettes per day, and stated that he used to abuse marijuana, but not anymore. Id. Dr. Schwarz diagnosed bipolar disorder, alcoholism, marijuana abuse, and

---

[12]Polycythemia is a condition marked by an abnormal increase in the number of circulating red blood cells. THE AMERICAN HERITAGE DICTIONARY 961 (2nd ed. 1982).

[13]Xanax is used to treat anxiety disorders and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684001.html

[14]Daypro is used to relieve pain, inflammation, tenderness and stiffness caused by osteoarthritis and rheumatoid arthritis. http://www.nlm.nih.gov/ medlineplus/druginfo/medmaster/a693002.html

[15]The record indicates two different spellings for this physician's surname: "Schwarz" and "Swarz." For the sake of consistency, this Court will use the spelling "Schwarz."

erectile dysfunction, and prescribed Wellbutrin.[16] (Tr. 222.) Jefferson Memorial Hospital records indicate that Plaintiff tested positive for marijuana on May 28, 2002. (Tr. 231.)

On June 24, 2002, Plaintiff was seen by Farris Jackson, Jr., M.D., with complaints of emphysema, nocturnal myoclonus, and obstructive sleep apnea.[17] (Tr. 200.) Dr. Jackson noted that Plaintiff was taking Wellbutrin, Depakote[18], BuSpar, Effexor, Atrovent, Advair, Albuterol and Sinemet. Id. Plaintiff stated that the Advair had caused some chest pain, but that he had good results with the Albuterol and Atrovent. Id. Plaintiff stated he smoked about eight cigarettes per day, and that he had been smoking marijuana heavily, but had quit. Id. Dr. Jackson noted a slightly productive cough, and diminished breath sounds bilaterally without active wheeze or consolidation. (Tr. 200.) Dr. Jackson referenced the prior sleep study and noted that Plaintiff suffered from obstructive sleep apnea. (Tr. 201.) Dr. Jackson continued

---

[16]Wellbutrin is used to treat depression and to aid in smoking cessation. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695033.html

[17]Dr. Jackson is affiliated with Dr. Breite.

[18]Depakote, or Valproic Acid, is used, alone or with other drugs, to treat certain types of seizures in the treatment of epilepsy. It is also used to prevent migraine headaches and to treat various psychiatric illnesses, such as bipolar disorder and aggression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682412.html

Plaintiff on Sinemet, changed Plaintiff's Albuterol and Atrovent to Combivent,[19] and instructed Plaintiff to quit smoking. Id.

Dr. Crawford's records indicate that Plaintiff sought treatment on July 1, 2002 with complaints of leg and back pain, stating that he injured his back at work. (Tr. 213.) Examination revealed negative straight leg raising, and lumbar/thoracic muscle tightness. Id. Plaintiff was diagnosed with a lumbar strain and prescribed Flexeril[20] and Anaprox.[21] Id.

Records from Dr. Schwarz's office indicate that, in July of 2002, Plaintiff continued to take Wellbutrin and Depakote. (Tr. 198.)

Records from the Missouri Department of Corrections indicate Plaintiff was examined in the medical clinic on September 5, 2002, with a history of restless leg syndrome. (Tr. 169.) The treatment notes indicate that Plaintiff had been taking Carbidopa-Levodopa,[22] and Plaintiff was continued on this medication by Dr.

---

[19]Combivent is a bronchodilator used to prevent wheezing, shortness of breath and troubled breathing associated with chronic obstructive pulmonary disease, or COPD. http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a601063.html

[20]Flexeril is a muscle relaxant used to relieve pain caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/ medlineplus/druginfo/medmaster/a682514.html

[21]Anaprox is used to relieve the pain, tenderness, inflammation (swelling), and stiffness caused by gout, arthritis, and other inflammatory conditions. http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a681029.html

[22]Levodopa is used alone or in combination with Carbidopa to improve muscle control to treat symptoms of Parkinson's disease. http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202326.html

Keper.  Id.  Plaintiff was again seen in the clinic on September 6, 2002, at which time he received a dental exam and a hearing screen, and was tested for HIV and Hepatitis, both of which were negative.  (Tr. 167-68.)

On September 11, 2002, Plaintiff underwent radiological studies which revealed post-surgical changes of Plaintiff's bilateral hips, and a suggestion of slight loosening of the partially cannulated screws within the right hip.  (Tr. 171.) Plaintiff was seen again in the clinic on October 7, 2002 complaining of a toothache, was diagnosed with abscesses in two teeth, and was given over-the-counter analgesics.  (Tr. 172.) Plaintiff was seen in follow-up on October 14, 2002, and the abscessed teeth were extracted.  (Tr. 174-75.)

On October 16, 2002, Plaintiff was seen in the prison clinic by Dr. Michael Sands.  (Tr. 177.)  Dr. Sands noted a history of restless leg syndrome controlled with medication, noted no new complaints, and continued Plaintiff on his current medications.  Id. Also on this date, Plaintiff saw Dr. Edward A. Lauer with complaints of nearsightedness.  (Tr. 181.)  Plaintiff was examined for an eyeglass prescription, and received eyeglasses on October 29, 2002. (Tr. 185.)  On October 22, 2002, Plaintiff was seen by Dr. Paul L. Robertson for removal of his dental sutures.  On October 24, 2002, Plaintiff was seen again by Dr. Sands complaining of difficult

respiration and a minimally productive cough. (Tr. 178.) Dr. Sands noted diminished breath sounds and prolonged expiration, and assessed emphysema. Id. Dr. Sands prescribed an Albuterol inhaler. Id. Chest x-rays taken on October 29, 2002 revealed mild hyperinflation of the lungs bilaterally, but no active infiltrates or effusion. (Tr. 185.) A November 5, 2002 "nurse encounter" note appears to indicate Plaintiff reported pain, and was referred to a physician for "chronic pain," but there is no indication of what part of Plaintiff's body was involved or what treatment was dispensed. (Tr. 187.) On November 11, 2002, Plaintiff had blood work done. (Tr. 189.)

The prison records indicate that, on November 14, 2002, Plaintiff requested a referral to a doctor to obtain pain medication, apparently due to pain in his hips. (Tr. 190.) On November 20, 2002, Plaintiff was seen by Dr. Cochran complaining of difficulty breathing due to emphysema. (Tr. 191.) Dr. Cochran prescribed Erythromycin[23] and scheduled a re-evaluation. Id. Plaintiff was seen in follow-up on November 22, 2002, when it was noted his lungs were coarse and diminished, with no wheezes heard. Id. Plaintiff did not show for a November 25, 2002 appointment, and Plaintiff's evening dose of Valproic Acid (Depakote) was discontinued by a Dr. Walker due to Plaintiff's non-compliance.

---

[23]Erythromycin is an antibiotic used to treat upper respiratory infections.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682381.html

(Tr. 192.)  Specifically, it was noted that Plaintiff had missed his last ten doses.  (Tr. 192.)  Plaintiff's morning dose was, however, retained.  (Tr. 193.)

On December 24, 2002, Plaintiff requested over-the-counter medicine, but it is not indicated why the request was made or what medication, if any, was dispensed.  (Tr. 194.)  The Department of Corrections records further indicate that Plaintiff received mandatory HIV testing on December 30, 2002, the results of which were negative, and that he refused an influenza vaccine on December 5, 2002.  (Tr. 194-95.)  Plaintiff was released from prison on January 2, 2003.  (Tr. 55.)

On February 19, 2003, Plaintiff was seen by Dr. Ronald Beach, M.D., a psychiatrist at Community Treatment, Inc. ("COMTREA"), as required by the conditions of his parole.  (Tr. 159-60; 162.)  Plaintiff stated that he had run out of his prescriptions, Depakote and Wellbutrin, and could not afford to renew them.  (Tr. 159.)  Plaintiff reported being stable without mood swings while on medication, and that his last significant depression occurred following his release from prison.  Id. Plaintiff apparently told Dr. Beach that he was on probation from a domestic fight five years ago, and had his probation revoked after being caught smoking marijuana.  Id.  Plaintiff reported that his last manic swing was in December 2002 when he learned he would be released from prison early.  Id.

Dr. Beach noted that Plaintiff was first started on medication five years ago while going through a divorce. (Tr. 159.) He was initially given Prozac[24] and Effexor, and then started on Depakote and Wellbutrin in July 2002. <u>Id.</u> Dr. Beach noted Plaintiff's prior inpatient treatment at the Hyland Center five years ago, the Salem Treatment Center three years ago, and the Athena Program for treatment of marijuana abuse eighteen months ago. <u>Id.</u>

Plaintiff reported working part-time, and further reported he last worked full-time in July of 2002, having worked two to three years in a steel fabricating plant. <u>Id.</u> He reported currently taking medication for emphysema and using an Albuterol inhaler. Plaintiff told Dr. Beach that he began using marijuana in high school, and that his last use was about one year ago. (Tr. 160.) Plaintiff admitted using alcohol in the past but denied that it was ever a problem. <u>Id.</u> Plaintiff stated that he stopped drinking because it interfered with his marijuana usage. <u>Id.</u> Dr. Beach diagnosed bipolar I disorder, emphysema, rule out restless leg syndrome, status post bilateral hip surgery at age eleven, and, on Axis IV, problems with the legal system and infrequent employment. <u>Id.</u> Dr. Beach continued Plaintiff on Depakote and Wellbutrin.

On April 9, 2003, Plaintiff was seen for the second and final time by Dr. Beach at COMTREA, and reported he continued to be

---

[24]Prozac is used to treat depression.  http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202247.html

stable. (Tr. 161.) He denied any side effects from medications, and reported they continued to be effective. Id. He reported he was unable to find employment despite continuing to look. Id. Dr. Beach noted that Plaintiff continued to be alert and oriented, noted no evidence of thought disorder, and continued Plaintiff on Depakote and Wellbutrin. Id. Dr. Beach recommended that Plaintiff return to COMTREA in two months for treatment, but there is no evidence in the record that Plaintiff did so. See, Id.

On June 5, 2003, Plaintiff was examined and his medical records were reviewed by Michael J. O'Day, D.O., for an assessment of disability. (Tr. 136-143.) Dr. O'Day noted that Plaintiff was taking Advair, Wellbutrin, Depakote and Albuterol. (Tr. 136.) Dr. O'Day further noted that Plaintiff continued to smoke one pack of cigarettes per day. Id. Dr. O'Day noted that sleep studies at Jefferson Memorial Hospital indicated distorted sleep architecture, complicated by restless leg syndrome. Id. Dr. O'Day noted that C-PAP therapy was attempted to treat Plaintiff's sleep disturbances, but stopped due to Plaintiff's intolerance of the device. Id. Dr. O'Day noted that, at the age of eleven, Plaintiff underwent bilateral pinning of the epiphyseal plates of the hips at Cardinal Glennon Children's Hospital, and further noted that x-rays taken in 2002 during Plaintiff's incarceration showed some static degenerative changes at the hips, but there were no plans for surgery. (Tr. 136-37.) Dr. O'Day noted that Plaintiff carried a walking stick in his right hand when expecting to walk for lengthy

- 18 -

distances, but did not use an actual cane. Dr. O'Day noted that Plaintiff had worked trimming aluminum siding for his brother and had performed other "pick-up" jobs in recent years, and was finding it difficult to stand for prolonged periods of time. (Tr. 137.) Dr. O'Day found no history of frequent respiratory tract infections, pneumonia, tuberculosis or hemoptysis, and noted that Plaintiff used his Albuterol occasionally. Id.

Upon examination, Dr. O'Day noted that Plaintiff's lungs were free and clear of wheezing and rhonchi bilaterally, and further noted Plaintiff essentially had full range of motion of both hips, although full abduction on the left was uncomfortable. (Tr. 138.) The remainder of the exam of Plaintiff's lower extremities was normal. Id. Dr. O'Day diagnosed status post pinning of both femoral capital epiphyses with a good clinical outcome, with some loss of active/passive motion of the hips as expected but no plans for surgery. Id. Dr. O'Day found Plaintiff's bipolar affective disorder to be under effective management, and further found mild reversible airway disease. Id. Dr. O'Day concluded as follows:

> I believe this gentleman could stand and walk a combined total of 4 hours daily with appropriate rest periods. I do not believe that he requires assisted ambulation and I believe he is able to sit for at least six hours daily with appropriate rest periods. He can bend and stoop without restriction. I think he could crouch, squat and kneel at least occasionally. I believe that he would be able to lift and transport 35 pounds on an occasional basis. Traveling capability is minimally restricted. Communication skills are intact. Fingering, handling and grasping with

the upper extremities is not restricted. Repetitive heavy foot controls bilaterally would not be feasible though could be done on an occasional basis.

(Tr. 138.)

On June 17, 2003, Dr. Donald Edwards completed a Physical Residual Functional Capacity Evaluation. (Tr. 86-93.) Dr. Edwards noted Plaintiff's primary diagnosis of post-surgical avascular necrosis of the hips, and his secondary diagnosis of emphysema, restless leg syndrome, and sleep apnea. (Tr. 86.) According to Dr. Edwards, Plaintiff was unlimited in his ability to push or pull, was able to occasionally lift 20 pounds and frequently lift ten pounds, and was able to stand and/or walk six hours in an eight-hour workday. (Tr. 87.) Dr. Edwards noted no postural limitations except that Plaintiff could only "occasionally" climb a ladder, rope or scaffold, and noted no manipulative, visual, communicative or environmental limitations. (Tr. 88-90.) Dr. Edwards noted that his review of the medical records indicated no treatment for Plaintiff's hip complaints, and that x-rays taken in 2002 revealed only stable degenerative changes. (Tr. 87.) Regarding Plaintiff's lungs, Dr. Edwards further noted that testing performed on June 5, 2003 showed only mild obstructive defect, and further noted no hospitalizations or emergency room visits for lung problems. Id. Dr. Edwards concluded that, although Plaintiff's symptoms were attributable to a medically determinable impairment, the severity or duration of the symptoms was disproportionate to the expected severity or expected

duration on the basis of Plaintiff's medically determinable impairments. (Tr. 91.)

On June 18, 2003, James Spence, Ph.D., reviewed Plaintiff's records and completed a mental residual functional capacity assessment in checklist form. (Tr. 68-85.) Therein, Dr. Spence noted only moderate limitations in Plaintiff's ability to carry out detailed instructions and maintain attention for extended periods, get along with co-workers without distracting them, and to complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace. (Tr. 82-83.) Dr. Spence found that Plaintiff's medical records indicated that medication was effective in controlling Plaintiff's symptoms and, because the records did not indicate the level of severity Plaintiff alleged, Plaintiff's allegations were therefore only partially credible. (Tr. 80.) Dr. Spence concluded that Plaintiff retained the capacity to perform simple 1-2 step work. Id.

On August 27, 2003, Dr. Ronald Beach completed a medical source statement checklist indicating his opinion regarding Plaintiff's level of work-related restriction. (Tr. 130-32.) Dr. Beach noted that Plaintiff had a fair ability to behave in a stable manner, relate predictably to others, and be reliable. (Tr. 132.) Dr. Beach noted that Plaintiff appeared to maintain remission while compliant with his medication, but that, during a manic episode, will demonstrate poor judgment and poor work performance. Id.

On August 12, 2004, Plaintiff was seen for the first and only time by Snehal Gandhi, M.D. (Tr. 125.) This visit occurred after Plaintiff's hearing, and Plaintiff's attorney forwarded Dr. Gandhi's records to the ALJ on October 25, 2004. (Tr. 124.) Dr. Gandhi noted Plaintiff's health history as emphysema treated with Albuterol, restless leg syndrome managed with Sinemet, and bipolar disorder treated with Depakote and Wellbutrin. Id. Dr. Gandhi noted Plaintiff's complaints as bilateral hip pains related to childhood hip surgery for an unknown disease, which Dr. Gandhi speculated may be Perthe's Disease or avascular necrosis.[25] Id. Plaintiff denied taking any medication at present. (Tr. 125.) Upon examination, Dr. Gandhi noted that Plaintiff was comfortable and well-appearing, and was breathing without difficulty, despite poorly aerated lungs with moderate breath sounds, and further noted that Plaintiff was an "active cigarette smoker." Id. Dr. Gandhi also noted Plaintiff was well-oriented with clear speech and language, had symmetrical calves, and that he moved all four extremities with ease. Id. Dr. Gandhi opined that Plaintiff "probably" had chronic lung disease, a history of movement disorder and bipolar disorder, probable avascular necrosis of the hip causing pain which required

---

[25] Legg-Calve-Perthes disease is when the ball of the thighbone in the hip is deprived of blood, causing the bone to die. The blood supply returns over several months, bringing in new bone cells. These gradually replace the dead bone over two to three years. This condition is most common in boys aged four to eight years. http://www.nlm.nih.gov/medlineplus/ency/article/001264.htm

surgery and caused "OA/hardware-induced pain." <u>Id.</u> Dr. Gandhi
prescribed Sinemet and Albuterol, but did not prescribe any pain
medication. <u>Id.</u>

## IV.   The ALJ's Decision

The ALJ found that Plaintiff had performed no substantial
gainful activity since at least July 4, 2002, and had met the
insured status requirements on that date. (Tr. 19.) The ALJ found
that the medical evidence established that Plaintiff was status post
pinning of both femoral capital epiphyses with a good clinical
outcome, and further found that Plaintiff had bipolar affective
disorder under effective management, reversible airway disease, and
restless leg syndrome. <u>Id.</u> The ALJ found, however, that these
impairments did not meet, or equal in duration or severity, the
criteria established under the appropriate listings in Appendix 1,
Part 404, Subpart P, Regulations No. 4. <u>Id.</u>

The ALJ found that Plaintiff's allegations of symptoms,
or combination of symptoms, of such severity as to preclude all
types of work were inconsistent with the evidence as a whole and
were not persuasive. <u>Id.</u> The ALJ found that Plaintiff's
impairments precluded standing or walking more than two hours in an
eight-hour work day, sitting more than six hours in an eight hour
work day, lifting more than ten pounds frequently and twenty-five
pounds occasionally. (Tr. 19.) The ALJ found that Plaintiff could
not perform his past relevant work, but that, given Plaintiff's age,

education, past relevant work experience, and residual functional capacity ("RFC"), Plaintiff was able to perform work existing in significant numbers in the local or national economy, based upon Medical-Vocational Rule 201.21 of Table 1, Appendix 2, Subpart P, Regulations Number 4. Id. The ALJ found that Plaintiff had been capable of performing such other work and substantial gainful activity since the alleged onset date of July 4, 2002. Id. The ALJ found that Plaintiff was capable of performing less than a full range of light work, and a full range of sedentary work[26] as defined under 20 C.F.R. 404.1567(a) and 20 C.F.R. 416.967(a). (Tr. 17.) The ALJ found that Plaintiff's non-exertional limitations did not significantly compromise the range of sedentary work Plaintiff could perform. Id. The ALJ concluded that Plaintiff was not disabled, and had not been disabled, since the alleged onset date and through the date of his decision, citing 20 C.F.R. 404.1529(f) and 20 C.F.R. 416.920(f). (Tr. 18.)

In support of his decision, the ALJ noted that the medical evidence consistently established that Plaintiff's conditions were effectively controlled with medication, and that Plaintiff suffered no side effects. (Tr. 16.) The ALJ further noted that Plaintiff was, however, frequently without prescribed pain medication for his

---

[26]Sedentary work involves lifting not more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

alleged hip pain, and noted that the lack of strong pain medication was very inconsistent with Plaintiff's allegations of severe pain, citing Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994) in support. The ALJ further found that Plaintiff's assertion that he was unable to afford medication and treatment was not convincing because (1) the medical records do not document that Plaintiff was ever refused treatment or medication for any reason, including insufficient funds; (2) there was no persuasive evidence that the Plaintiff ever sought any form of financial aid to help defray the cost of medication or discussed alternative methods of payment with his treating physicians; and (3) Plaintiff was apparently able to afford to smoke cigarettes. Id. The ALJ also noted that Plaintiff testified that he often played his guitar, an activity requiring concentration, hand/eye coordination, and fine fingering, and concluded that this testimony was inconsistent with Plaintiff's allegations of disability. (Tr. 17.)

## V. Discussion

To be eligible for Social Security disability benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant

work.  If so, the claimant is not disabled.  If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform.  <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir.  2000).  Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).  Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion.  <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998).  To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ;

2. The plaintiff's vocational factors;

3. The medical evidence from treating and consulting physicians;

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5. Any corroboration by third parties of the plaintiff's impairments;

6. The testimony of vocational experts, when required, which is based upon a proper

> hypothetical question which sets forth the
> plaintiff's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86
(8th Cir. 1992), quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th
Cir. 1989).

The Court must also consider any "evidence which fairly
detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d
1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608.
However, where substantial evidence supports the Commissioner's
decision, the decision may not be reversed merely because
substantial evidence may support a different outcome. Briggs, 139
F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir.
1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, Plaintiff claims that the record does
not support the ALJ's finding regarding Plaintiff's RFC.
Specifically, Plaintiff argues that the decision failed to properly
consider the medical evidence of record and failed to properly
evaluate that evidence under the standards of 20 C.F.R. §§ 404.1527
and 416.927. Plaintiff also claims that the ALJ failed to fully and
fairly develop the record with respect to the treating physician,
and further failed to consider the opinion evidence of the treating
physician, Dr. Spence, and the records of Dr. Gandhi. Plaintiff
further argues that the ALJ failed to consider Plaintiff's
subjective complaints under the standards of Polaski v. Heckler, 739
F.2d 1320 (8th Cir. 1984). Finally, Plaintiff argues that, because
the record established that Plaintiff had significant non-exertional

impairments, the ALJ's decision is not based upon substantial evidence because it lacks vocational expert testimony. The undersigned will first address Plaintiff's arguments concerning the ALJ's determination of Plaintiff's RFC.

A.   RFC Determination

As set forth, _supra_, the ALJ in this matter determined that Plaintiff was unable to perform his past relevant work, but retained the residual functional capacity to perform other work existing in significant numbers, based upon Medical-Vocational Rule 201.21, Table No. 1, Appendix 2, Subpart P, Regulations No. 4. (Tr. 19.)   Plaintiff generally asserts that the decision failed to properly consider the medical evidence of record and failed to properly evaluate that evidence as contemplated by the Regulations and precedent.   Plaintiff further contends that the ALJ failed to insure the record was fully and fairly developed from the treating physician and failed to give his opinion proper deference, failed to properly consider the medical opinion evidence from Dr. Spence, and failed to consider the opinion of Dr. Gandhi.

Residual functional capacity is what a claimant can do despite his limitations.  20 C.F.R. §404.1545, _Lauer v. Apfel_, 245 F.3d 700, 703 (8th Cir.  2001).  At the fourth step, while the burden of proof is still upon the claimant, the Commissioner determines whether the claimant has the RFC to perform his or her past relevant work, and if so, the claimant is determined not disabled.  _Pearsall_, 274 F.3d at 1217.  If not, however, the process

continues to step five, where the burden shifts to the Commissioner to prove both that the claimant retains the RFC to perform other kinds of work, and that such work exists in substantial numbers in the national economy. Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), citing Nevland, 204 F.3d at 857. The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a).

A claimant's RFC is a medical question, however, and some medical evidence, along with all other relevant, credible evidence in the record, must support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217, McKinney, 228 F.3d at 863.

The undersigned turns first to Plaintiff's general assertion that the ALJ's decision was not based upon substantial

evidence on the record as a whole.  In his decision, the ALJ noted and extensively discussed Plaintiff's treatment for both his physical and mental impairments.  Regarding Plaintiff's treatment with Dr. Beach, whom Plaintiff alleges is his treating physician, the ALJ noted that Dr. Beach found no evidence of thought disorder, found Plaintiff's memory and judgment to be within normal limits, and, more significantly, noted that Depakote and Wellbutrin effectively controlled Plaintiff's condition and caused no side effects.  (Tr. 14); See Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995); Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993) (impairments controllable by treatment or medication are not disabling).  The ALJ also noted that Dr. Beach's records indicated that Plaintiff continued unsuccessfully to seek employment.[27] Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994) (claimant's statements that he was seeking work were inconsistent with disability).

The ALJ also noted Plaintiff's treatment with Dr. Breite, who treated Plaintiff for emphysema, sleep apnea and nocturnal kicking.  (Tr. 13.)  Again, the ALJ noted that Plaintiff's sleep disorders appeared to be "markedly improved" with medication and that, despite Plaintiff's smoking-induced emphysema, he only recently discontinued smoking marijuana, and continued to smoke cigarettes.  Id.; Roth, 45 F.3d at 282; Stout, 988 F.2d at 855

_____

[27]Plaintiff also testified during the hearing before the ALJ that he had submitted job applications for factory work.  (Tr. 279.)

(impairments controllable by treatment or medication are not disabling); Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000) (ALJ properly considered claimant's failure to follow doctor's advice to stop smoking in discrediting her subjective complaints).

The ALJ also noted that Plaintiff's treatment records from the Missouri Department of Corrections records revealed that Plaintiff's nocturnal kicking and his obstructive airway disease were controlled with medication, and that his lung condition further improved after he stopped smoking. (Tr. 14.) The ALJ also noted that Plaintiff's physical examination of September 6, 2002 revealed no new ailments or worsening of any of Plaintiff's conditions, and noted that Plaintiff's chest x-rays revealed only mildly hyperinflated lungs and no infiltrates or effusion. Id.

The ALJ also noted Dr. O'Day's consultative examination of June 5, 2003. (Tr. 15.) Therein, Dr. O'Day noted that Plaintiff continued to smoke, despite medical advice. Id. Dr. O'Day noted no marked impairment in Plaintiff's major body systems, specifically noted that his lungs were clear of wheezing and rhonchi, and that Plaintiff used Albuterol only occasionally. Id. Dr. O'Day noted that the condition in Plaintiff's lower extremities did not preclude independent ambulation, and noted no plans for surgery. Id. The ALJ noted that Dr. O'Day found Plaintiff's bipolar disorder to be effectively managed with medication, and noted that, in an eight-hour work day, Plaintiff could stand for four hours, sit for six hours, bend and stoop without restriction, crouch and kneel

occasionally, lift and carry thirty-five pounds occasionally, and travel on a minimally restricted basis. (Tr. 15.) Finally, the ALJ noted that Dr. O'Day found that Plaintiff's fingering, handling and grasping abilities were unrestricted, and his communication skills remained intact. Id. The ALJ concluded that Dr. O'Day's findings were inconsistent with Plaintiff's assertions that he was unable to perform any type of work activity. Id.

Finally, the ALJ noted the absence of evidence of any objective signs of debilitating physical or mental illness, such as muscle atrophy or loss of muscle tone, and also noted the lack of evidence that any physician ever told Plaintiff to stop working. Id. The Eighth Circuit has consistently considered it significant when no treating physician concludes that a claimant is disabled and unable to perform any type of work. Anderson, 51 F.3d at 779; Russell v. Sullivan, 950 F.2d 542, 544 (8th Cir. 1991).

A review of the medical evidence of record, and the ALJ's findings based thereon, reveals that he properly exercised his discretion in evaluating the evidence on the record as a whole.

Plaintiff further submits that the ALJ erred by failing to properly consider Dr. Beach's opinion, expressed in his August 27, 2003 medical source statement checklist, indicating Plaintiff had "significant impairment" due to depression and anxiety. Plaintiff characterizes Dr. Beach as a treating physician, even though Plaintiff saw him only twice for a combined total of less

than one hour, and apparently failed to return for additional treatment as Dr. Beach recommended. See, (Tr. 159-161.)

Ordinarily, a treating physician's opinion should not be discarded and is entitled to substantial weight. Singh, 222 F.3d at 452, citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991). A treating physician's opinion will be granted controlling weight, provided it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. Singh, 222 F.3d at 452, citing Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). This is so because a treating source has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to afford the opinion. Id. Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating source provides support for his findings,

whether other evidence in the record is consistent with the findings, and the treating source's area of specialty. Id. The Regulations further provide that the Commissioner "will always give good reasons . . . for the weight [given to the] treating source's opinion." Id.

In this case, the ALJ did not err by failing to find Plaintiff disabled based upon Dr. Beach's August 27, 2003 checklist. Therein, Dr. Beach imposes only mild to moderate restrictions that are not wholly inconsistent with the ALJ's finding that Plaintiff is capable of less than a full range of light work, and a full range of sedentary work, as defined under 20 C.F.R. 404.1567(a) and 20 C.F.R. 416.967(a). Even so, Plaintiff argues that Dr. Beach's statement that Plaintiff, during a manic episode, will exercise poor social judgment and exhibit poor work performance supports a finding of disability. (Tr. 132.) However, in the text immediately preceding this notation, Dr. Beach notes that Plaintiff "maintain[ed] remission" when he took his medication, and there is further no evidence anywhere in Dr. Beach's records that Plaintiff ever suffered a manic episode while seeing Dr. Beach. The statement regarding Plaintiff's potential behavior while manic, therefore, is merely conclusory, and is not entitled to deferential weight. Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) (treating physician's opinion deserves no controlling weight when it merely consists of vague and conclusory statements).

Even assuming, _arguendo_, that Dr. Beach's August 27, 2003 checklist could be viewed as supportive of a finding of disability, the undersigned could not say that the ALJ erred in failing to defer to it. The record indicates that Plaintiff saw Dr. Beach on only two occasions for a combined total of less than one hour's time, hardly long enough to allow Dr. Beach to establish the "broad, longitudinal view" of Plaintiff's impairments contemplated by the Regulations that would entitle his opinion to deferential treatment by the ALJ. _See_ 20 C.F.R. §§ 404.1527(d)(2); _see also_, 416.927(d)(2)(i) (a treating source's opinion will receive weight comparable to the length of the treatment relationship and the number of times the source examined the claimant). For the sake of further argument, if the report could be viewed as supporting a finding of disability, it would be inconsistent with the balance of Dr. Beach's records and with the substantial evidence on the record as a whole. As discussed above, when Dr. Beach examined Plaintiff, he noted that Plaintiff's conditions were well-controlled with medication, and imposed no restrictions on Plaintiff's activities. (Tr. 159-61); _Bentley v. Shalala_, 52 F.3d 784, 786 (8th Cir. 1995) (where a treating physician's opinion is itself inconsistent, it should be accorded less deference). In addition, the medical evidence on the record as a whole overwhelmingly supports the conclusion that all of Plaintiff's impairments were well-controlled with medication. _Singh_, 222 F.3d at 452 (treating physician's opinion entitled to deference provided it is not inconsistent with

the other substantial evidence in the record).  Finally, the report at issue was in checklist form.   Although such checklists are admissible and must be considered along with the other evidence of record, they are entitled to little weight in the evaluation of disability under the medical opinion hierarchy of 20 C.F.R. § 404.1527(d).  The Eighth Circuit has held that, "[b]ecause of the interpretive problems inherent in the use of forms such as the physical capacities checklist, our Court has held that while these forms are admissible, they are entitled to little weight and do not constitute substantial evidence on the record as a whole." Camp v. Schweiker, 643 F.2d 1325, 1333-1334 (8th Cir. 1981); Gilliam v. Califano, 620 F.2d 691, 693 (8th Cir. 1980); Landess v. Weinberger, 490 F.2d 1187, 1189 (8th Cir. 1974).

Next, Plaintiff contends that the ALJ failed to fully and fairly develop the record because he did not re-contact Plaintiff's treating physician.   However, Plaintiff is not specific regarding what evidence required further clarification or what the ALJ allegedly overlooked.   "While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Goff, 421 F.3d at 791.   The Regulations require the ALJ to re-contact physicians when the evidence is consistent but insufficient to decide whether the claimant is disabled; or if after weighing the

evidence, the ALJ is unable to decide whether the claimant is disabled. 20 C.F.R. § 416.927(c)(3).

In the instant matter, there were no undeveloped "crucial issues" requiring the ALJ to re-contact any of the physicians involved in Plaintiff's evaluation and/or treatment. The medical evidence of record clearly and consistently established that Plaintiff's conditions were controlled with medication and that Plaintiff suffered no significant or disabling side effects from that medication, and further established that Plaintiff's conditions were of insufficient severity to warrant a finding of disability. In addition, because Plaintiff failed to specify exactly what evidence the ALJ overlooked, he cannot establish a basis for remand. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (because claimant did not inform the court as to what additional medical evidence should be obtained, claimant failed to establish that the ALJ's alleged failure to fully develop the record resulted in prejudice, and therefore provided no basis for remanding for additional evidence).

Plaintiff also contends that the ALJ erred in failing to properly consider the opinion of Dr. Spence regarding Plaintiff's mental impairments. As noted, supra, on June 18, 2003, Dr. Spence reviewed Plaintiff's medical records and completed a mental residual functional capacity assessment checklist, in which he checked boxes indicating that Plaintiff had moderate impairments in functioning. (Tr. 68-85.) This report is not particularly helpful to Plaintiff.

Dr. Spence noted Plaintiff's medical treatment and the fact that his conditions responded well to medication, and further noted Plaintiff's alleged symptoms. Following his review, Dr. Spence stated that, although Plaintiff had some conditions which "could reasonably account for some of his symptoms," the medical evidence review showed that medications were effective, and did not indicate the level of severity that Plaintiff alleges. (Tr. 80.)

Plaintiff finally contends that the records of Dr. Gandhi were not properly considered, and that they support the contention that Plaintiff is disabled and requires surgery due to his hip condition.[28] A review of the records, however, reveal that they provide no conclusive evidence of whether Plaintiff has any particular hip condition, or whether he is actually a candidate for surgery. As noted, supra, Dr. Gandhi saw Plaintiff only once, for twenty minutes, on August 12, 2004. (Tr. 125.) Because Dr. Gandhi's records do not indicate that any radiological studies or other diagnostic tests were performed or reviewed, it seems apparent that Dr. Gandhi's conclusions are based merely on Plaintiff's subjective complaints and history of hip surgery. See Id. Dr. Gandhi merely concluded that he "suspected" Plaintiff had Perthe's disease, and that Plaintiff had "probable" avascular necrosis of the

---

[28]Although the ALJ did not specifically discuss the records of Dr. Gandhi, it cannot be assumed that he failed to consider them. An ALJ is not required to discuss in detail every piece of evidence submitted, and a failure to cite to certain evidence does not mean it was not considered. Brewster v. Barnhart, 366 F.Supp. 2d 858, 872 (E.D. Mo., 2005), citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

hip causing pain requiring surgery.  Id.  This does not constitute

"substantial evidence" upon which any reasonable person could have

concluded that Plaintiff actually had any particular hip condition

or required surgery.  Dr. Gandhi's statements regarding Plaintiff's

hip condition and his need for surgery are merely conclusory, are

not based upon any clinical or laboratory diagnostic techniques, and

are further unsupported by the evidence contained in the record as

a whole.  Metz v. Shalala, 49 F.3d 374, 377 (8th Cir.  1995)

(physician's conclusory statement without supporting evidence does

not amount to substantial evidence of disability); Woolf, 3 F.3d at

1213-14 (physician's opinion may be discounted when based only on

claimant's subjective complaints of pain and there is no testing or

objective medical evidence to support opinion); Ward v. Heckler, 786

F.2d 844, 846 (8th Cir.  1986) (per curiam) (physician's opinion

must be supported by medically acceptable clinical or diagnostic

data).  Finally, Dr. Gandhi was merely a consulting physician who

saw Plaintiff on one occasion for a very brief period of time, and

therefore his opinion, standing alone, cannot constitute substantial

evidence.  See Singh, 222 F.3d at 452, citing Kelley, 133 F.3d at

589 (the opinion of a consulting physician who examines a claimant

once does not generally constitute substantial evidence).

A review of the ALJ's determination of Plaintiff's RFC

reveals that he properly exercised his discretion and acted within

his statutory authority in evaluating the evidence on the record as

a whole.  The ALJ based his decision on all of the relevant,

credible medical evidence, and did not err in failing to adopt the opinion evidence of Drs. Beach, Spence, or Gandhi. For the foregoing reasons, the undersigned finds that the ALJ's determination of Plaintiff's residual functional capacity was based upon substantial evidence on the record as a whole.

B.   Plaintiff's Subjective Complaints

Plaintiff next contends that the ALJ's decision runs afoul of Polaski in that it erroneously found Plaintiff's testimony regarding his subjective complaints not credible. Plaintiff specifically alleges that, in his analysis, the ALJ erroneously analyzed evidence which showed that Plaintiff was frequently without medication; that he alleged he was unable to afford medication; that no physician opined he was disabled; that he did not need an assistive device; that he was not medically compliant; and that his report of his daily activities contained inconsistencies.

"A claimant has the burden of proving that his disability results from a medically determinable physical or mental impairment." Polaski, 739 F.2d at 1321. However, testimony regarding pain is necessarily subjective in nature, as it is the Plaintiff's own perception of the effects of his alleged physical impairment. Id.; Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Id. at 1321-22. The Eighth Circuit addressed this

difficulty in <u>Polaski</u>, and established the following standard for the evaluation of subjective complaints:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."

> <u>Id.</u> at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations alone, he or she may discount such complaints if there are inconsistencies in the evidence as a whole. <u>Id.</u> The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. <u>Gregg v. Barnhart</u>, 354 F.3d 710, 713-14 (8th Cir. 2003). When an ALJ explicitly considers the <u>Polaski</u> factors and discredits a claimant's complaints for a good reason, that decision should be upheld. <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with

deference the ALJ's decision on the subject . <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005).

In this case, after specifically citing <u>Polaski</u> and the necessary factors therefrom, the ALJ discussed numerous inconsistencies from the record to support his conclusion that Plaintiff's subjective complaints were not credible. (Tr. 12.) First, the ALJ noted that Plaintiff was frequently without strong pain medication. (Tr. 15); <u>Haynes</u>, 26 F.3d at 814 (a lack of strong pain medication is inconsistent with subjective complaints of disabling pain). The ALJ also noted that Plaintiff failed to seek treatment on a regular basis through physical therapy, a work hardening program or a pain clinic. (Tr. 15-16); <u>Benskin v. Bowen</u>, 830 F.2d 878, 884 (8th Cir. 1987) (ALJ is entitled to find that failure to seek medical attention is inconsistent with subjective complaints of pain).

Plaintiff contends that he was without pain medication due to financial constraints. However, the ALJ noted that the medical records did not document that Plaintiff was ever refused treatment or medication for any reason, including insufficient funds, and further found no persuasive evidence that Plaintiff ever sought any form of financial assistance or asked any doctors about possible alternative means of payment to help defray the cost of treatment or medication. (Tr. 15); <u>Benskin</u>, 830 F.2d at 884 n.1 (A claimant's financial situation and real reasons for failing to seek treatment, are questions of fact that are for the ALJ to decide). The ALJ

- 43 -

finally noted that the evidence established that, despite Plaintiff's alleged inability to afford medication, the record established that he was able to afford to smoke cigarettes. Id.; see Norman v. Apfel, 48 F.Supp. 2d 905, 909 (W.D. Mo. 1999) (plaintiff's ability to purchase cigarettes conflicts with her statement that she could not afford medication).

Plaintiff next contends that the ALJ failed to undertake the proper inquiry into whether treatment would restore Plaintiff's ability to work or sufficiently improve his condition before discrediting Plaintiff's testimony. However, in his decision, the ALJ specifically noted that the medical evidence of record indicated that Plaintiff was repeatedly told to stop smoking, and that smoking cessation would not only stop the progression of Plaintiff's emphysema, it would most likely reverse the damage already done. (Tr. 16.)

The ALJ further found that the medical records did not document that any treating physician ever found or imposed any long term, significant and adverse mental or physical limitations upon Plaintiff's functional capacity, finding this inconsistent with Plaintiff's testimony that his pain limits his activities. (Tr. 16.) The ALJ further discredited Plaintiff's testimony that he required a cane to ambulate. Id. The ALJ noted the absence of any evidence in the record that Plaintiff was ever advised to use a cane, and further noted the report of Dr. O'Day, who specifically stated that Plaintiff did not need an assistive device for

ambulation. Id. The ALJ noted that the medical records did not document any worsening of any of Plaintiff's conditions, nor did they contain any evidence of long-term, significant atrophy or loss of muscle tone which would tend to prove that Plaintiff suffered debilitating mental and physical pain and limitations. Id.; See 20 C.F.R. §§404.1528(b) and 404.1529(a). Finally, the ALJ briefly noted Plaintiff's poor work history, finding that Plaintiff left his last employer to serve a prison sentence, not because of any disabling condition. (Tr. 17); Woolf, 3 F.3d at 1214 (a poor work history diminishes a claimant's credibility).

In consideration of all of the foregoing, the ALJ determined that Plaintiff's subjective testimony of symptoms sufficient to preclude all work activity was not credible. (Tr. 17.) A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ considered Plaintiff's subjective complaints on the basis of the entire record before him, and set out numerous inconsistencies detracting from Plaintiff's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ's credibility determination is supported by good reasons and substantial evidence on the record as a whole, this Court must accord it deference. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Hogan, 239 F.3d at 962.

C.  Non-exertional impairments

Plaintiff finally contends that the ALJ erred when he relied upon the Medical-Vocational Guidelines in determining that Plaintiff was able to engage work that existed in the national economy. Plaintiff argues that he suffers from significant non-exertional impairments requiring the ALJ to solicit the testimony of a vocational expert regarding Plaintiff's ability to work.

When an ALJ determines, as here, that a claimant is unable to return to his past relevant work, the burden shifts to the Commissioner to show that the claimant is able to engage in work that exists in the national economy. Harris v. Shalala, 45 F.3d 1190, 1194 (8th Cir. 1995), citing Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992). When only exertional impairments are present, the Commissioner may meet this burden by relying on the Medical-Vocational Guidelines. Bolton v. Bowen, 814 F.2d 536, 537 n.3 (8th Cir. 1987). In the presence of non-exertional impairments, however, the ALJ may rely upon the Guidelines only if he or she makes a finding, supported by the record, that "the non-exertional impairment does not significantly diminish Plaintiff's residual functional capacity to perform the full range of activities listed in the Guidelines." Harris, 45 F.3d at 1194, citing Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir. 1988). Absent such a finding, the Guidelines do not control, and the ALJ must call a vocational expert or produce other similar evidence to establish that there are jobs available in the national economy for a person with the

claimant's abilities.  <u>Harris</u>, 45 F.3d at 1194; <u>Sanders</u>, 983 F.2d at 823; <u>Thompson</u>, 850 F.2d at 350.  The Eighth Circuit has provided some guidance in applying this standard:

> In this context "significant" refers to whether the claimant's non-exertional impairment or impairments preclude the claimant from engaging in the full range of activities listed in the Guidelines under the demands of day-to-day life.  Under this standard isolated occurrences will not preclude use of the Guidelines, however persistent non-exertional impairments which prevent the claimant from engaging in the full range of activities listed in the Guidelines will preclude the use of the Guidelines to direct a conclusion of disabled or not disabled.  For example, an isolated headache or temporary disability will not preclude the use of the Guidelines whereas persistent migraine headaches may be sufficient to require more than the Guidelines to sustain the [Commissioner's] burden.

<u>Thompson</u>, 850 F.2d at 350.

In his decision, the ALJ discussed the medical evidence as noted herein above, and found as follows:

> The substantial evidence does not establish the existence of any other persistent, significant and adverse limitation of function due to any other ailment.  The claimant is capable of performing less than a full range of light work and can perform the full range of sedentary work as defined under 20 CFR 404.1567(a) and 20 CFR 416.967(a).  The claimant's non-exertional limitations do not significantly compromise the range of sedentary work that the claimant can perform.
>
> (Tr. 17.)

Plaintiff claims that the ALJ failed to consider his non-exertional impairment of restless leg syndrome as indicated in the records of Dr. Breite.  Similarly, Plaintiff contends that the records of Dr. Beach reflect marked impairments, but Plaintiff does not specify what condition the ALJ should have considered.  These arguments are not compelling.  As discussed, supra, the ALJ specifically noted the records of Drs. Breite and Beach, and concluded that they all consistently indicated that Plaintiff's restless leg syndrome and psychological symptoms were controlled with medication.  Roth, 45 F.3d at 282; Stout, 988 F.2d at 855 (impairments controllable by treatment or medication are not disabling).

Finally, Plaintiff argues that two GAF scores, a 40 and a 55, support a conclusion that he has significant non-exertional impairments.  However, the first score of 40 was noted by Dr. Schwarz in May of 2002, and therefore pre-dates Plaintiff's alleged onset of disability.  The second, a 55, was noted in Dr. Beach's treatment notes, the same treatment notes which indicate that Plaintiff was stable and without mood swings while on medication.  Furthermore, a GAF of 55 is indicative of only moderate symptoms, and is therefore not wholly inconsistent with the ALJ's finding that Plaintiff is able to perform less than a full range of light work and the full range of sedentary work.  Finally, there is no evidence indicating that either doctor assigned the GAF scores because they perceived an impairment in Plaintiff's ability to work.  See Quaite

v. Barnhart, 312 F.Supp.2d 1195, 1200 (8th Cir. 2004) (A GAF score, standing alone, does not establish an impairment seriously interfering with Plaintiff's ability to perform basic work activities).

The undersigned concludes that in the present case the ALJ's use of the Guidelines was proper.  There is substantial evidence in the record to support the determination that Plaintiff's alleged non-exertional impairments did not significantly diminish his RFC to perform less than a full range of light work and the full range of sedentary work as defined under 20 C.F.R. 404.1567(a) and 20 C.F.R. 416.967(a).  The undersigned therefore finds that the ALJ's decision to rely upon the Guidelines and not call a vocational expert is supported by substantial evidence on the record as a whole.

Therefore, for all of the foregoing reasons, the Commissioner's decision is supported by substantial evidence on the record as a whole.  Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a different outcome, or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001; Browning, 958 F.2d at 821.  Accordingly, the decision of the Commissioner in denying Plaintiff's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is hereby affirmed and Plaintiff's Complaint is hereby dismissed with prejudice.

Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of September, 2006.